RECEIVED & FILED

SEP 0 8 2005

ANDROSCOGGIN
SUPERIOR COURT

STATE OF MAINE
ANDROSCOGGIN, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No.   CV-01-229

MORSE BROTHERS, INC.

      Plaintiff

   v.

**DECISION AND JUDGMENT**

LANE SUPPLY COMPANY,

      Defendant

Morse Brothers, Inc. is engaged in the business of producing bark mulch and related products at its manufacturing plant in Auburn. Lane Supply Company is an engineering design and fabrication firm that produces equipment for the paper and lumber industry.

## I. NATURE OF CASE

This is an action for damages alleging that defendant did not properly design and install certain equipment for plaintiff's bark mulch manufacturing operation.

Morse Bros. filed an eight-count complaint against Lane Supply alleging breach of contract (Counts I and II), breach of warranty (Counts III and IV), negligence (Count V), negligent misrepresentation (Counts VI and VII) and restitution (Count VIII).

Defendant Lane Supply generally acknowledges conducting business with Morse Bros. to assist in the construction of a new production facility, but denies any allegation that would give rise to a breach of contract or warranty, negligence, or negligent misrepresentation. In addition, Lane Supply asserted thirteen affirmative

RECEIVED & FILED

defenses and asserts a counterclaim that Morse Bros. still owes money to it based on breach of contract (Count I) and unjust enrichment (Count II). In addition to money owed, Lane seeks an award of counsel fees, expenses, costs, and interest. The plaintiff, in turn, has denied essential allegations of the counterclaim and asserts multiple affirmative defenses.

## II. BACKGROUND

Morse Bros. is in the business of bark mulching and processing with a new factory in Auburn. It was previously based in Windham until it outgrew the capacity of its operations plant, encountered environmental issues, and a fire forced it to look for a new location and operating plant. Plans for construction of the Auburn facility were initiated in early 2000. Morse Bros. was aware that Lane Supply, based in Brewer, was involved in the design and construction of a similar facility for Jolly Gardener, a major competitor of Morse Bros., which is located in Poland, only a few miles from Morse Bros.'s new operation.

Morse Bros. solicited bids from Lane Supply and other companies for design, engineering plans, and materials. A formal contract with details and specifications was never executed by the parties, but the court does find that it was the intent of both parties to work cooperatively towards the design and construction of Morse Bros.'s new facility. Even though Lane Supply believes that it was acting primarily as a seller of machinery and equipment, rather than providing engineering and design services, Lane Supply was aware that Morse Bros.'s original call for assistance requested "... engineering, design, plans and bill of materials for the processing of [bark, soil, wood, and organic] materials through a manufacturing system outlined below." (D. Ex. 20.)

The request by Morse Bros. generally described the operation of two production lines, A and B. The production lines were to be electrically powered, to be housed within Morse Bros.'s new building, and with "a simple low manpower cleaning system to be included." (Def. Ex. #20).

Even though Lane Supply takes the position that it was primarily a seller and supplier of the equipment, it did respond to Morse Bros.'s initial request with direct reference to "design and layout of your new processing facilities" (Pl. Ex. #1), and quoted a cost of $12, 342.00 "to do layout plans and elevations" (Pl. Ex. #2), but would provide these services only in conjunction with selling the necessary equipment and/or components. (Pl. Ex. 1).

In addition, Michael Richardson, senior sales representative for Lane Supply, told Tim Morse that Lane Supply "could design mechanical equipment to convey through the plant. There was no caveat or limitation placed on Lane Supply's participation that it would only act as a middleman to supply certain equipment. Knowing that Lane Supply played a major role in the Jolly Gardener project, it was reasonable for Morse Bros. to rely on Richardson's representations.[1]

Morse has paid Lane Supply approximately $745,000 to plan, design, and manufacture component parts for the barking operation, and to secure machinery and necessary parts from other suppliers and manufacturers where necessary.

In addition to recovering from the fire, one of the primary goals of the new facility was to add a new production line and substantially increase Morse Bros.'s capacity.

---

[1] Michael Richardson was Lane's primary contact with Morse Brothers and was the primary coordinator and link between the two companies. Over-all, the court finds that he was not as informed about Morse's operation and the design, equipment and mechanics of operation as he should have been. As a witness,

In general, raw bark from trees is brought to the facility where it is stockpiled and then loaded into a feeder which conveys the bark into the system as needed where it is then ground into pieces two inches and smaller. Oversized pieces are filtered out and returned to the feeder for regrinding. This conveying process also filters out metal, glass, and other foreign material not intended to be part of the final product. Useable chips and small pieces are carried to a mixer/coloring machine where the product is mixed and colored for a uniform appearance. The bark mulch is automatically bagged, stacked, and sold by the pallet load. Morse Bros. also sells its product in bulk by the truckload by bypassing the bagging operation.

Morse Bros. claims that Lane Supply improperly designed the production line, that it continually jammed and did not properly screen the raw bark. These problems never allowed Morse Bros. to reach its desired capacity resulting in lost business and profits.

## III. FINDINGS [2]

This case is complicated by the lack of any formal written contract, specific plans, or firm agreement between the parties as to exactly what was the responsibility of each. Each party appears to have had a different concept of the final product, how to get there, and Lane Supply's role in the process. It is clear that Morse Bros. desired a system that would mirror their competitor, Jolly Gardener. Relying on their experience with the Jolly Gardener project, Morse Bros. relied upon Lane Supply for assistance without considering separate or independent advice or designs.

---

the court finds that much of his testimony carries little weight as to the design and effectiveness of Lane's products, the specifics of what Morse required and his failure to structure a sufficiently detailed contract.

[2] To the extent that the court recites facts based on evidence presented at trial, they constitute findings of fact unless otherwise stated.

4

Even without a written contract, full plans or specifications, each party was aware that the end product should function smoothly, produce a marketable product, and increase plaintiff's output to over 500 cubic yards per hour for each of two production lines. From the time when the machinery was first put into operation, it did not operate as anticipated. Parts of machinery and equipment destined for the second line were pirated and used to keep the first line in operation.

In the planning stages, Morse Bros. relied upon Lane Supply's representations that with its experience it could deliver a system to produce enough mulch to reach the desired capacity.

In addition to designing the system, Lane Supply purchased the required machinery from several vendors for resale to Morse Bros. The bulk of the installation work was performed by Morse Bros. Lane Supply employees had little role in the actual construction and installation of equipment.

Even after the fire, some equipment was salvaged from Morse Bros.'s old plant in Windham; however, two large mixing screens near the end of production line were completely destroyed in the fire.

## A. Mixing Screens

As part of its service to Morse Bros., Lane Supply manufactured two new identical mixing screens: Therein lies part of the problem.

Although the screens have identical functions, they are part of two separate production lines and must work in sync with each other and be mirror images because they operate in opposite directions at the end of the production lines. The court finds that this is a manufacturing error, clearly attributable to Lane Supply that amounts to both a breach of contract and breach of warranty.

Although it was Morse Bros.'s desire to have each line produce up to 500 cubic yards per hour, this level was not part of any contract or agreement between the parties. Such a production level was discussed; but the court finds that, at most, it was a goal, dependant on several variables, including the type of material placed in the system. Even the time of the year is an important factor as it affects the amount of sap or pitch in the system.

Notwithstanding other problems, Morse was unable to operate a second line without a properly functioning mixing screen.

In addition to the failure to properly manufacture the mixing screens, Morse Bros. complains of defects in four other components of the processing line.

## B. Metering Wheel

At the beginning of the production line where raw bark is initially fed into the system, a "meter wheel" knocks the top level of product onto the conveyor to provide an even flow. The wheel is powered by a gearbox on the shaft that was not strong enough. Excess force and torque on the gearbox would cause it to break into pieces, halting production. Lane Supply eventually provided a bigger gearbox which was paid for by Morse Bros. and Lane Supply provided a credit for the old one. Morse is entitled to recover for its labor in making repairs

## C. In-Feed Conveyor

After the product is placed on line though the metering wheel, it proceeds by conveyor to the hammermill for grinding. Morse Bros. complains that the belt would become dislodged and not stay on the conveyor. Lane Supply's original design was for a straight belt, but Tim Morse wanted a "nose over" design so that the belt would level off before the material went into the hammermill for grinding.

6

When the problems initially occurred, Lane Supply redesigned the conveyor which then worked satisfactorily.

The court finds that although the problems with the conveyor as originally designed and installed are based primarily upon Morse's desire for a "nose-over" conveyor, this concept was accepted by Lane through Michael Richardson. Lane is thus responsible for the costs associated with necessary repairs.

## D. Disc Screen

A disc screen is perhaps the most important part of the processing line. It allows bark mulch to pass over the top, screening out smaller sized pieces to fall onto a conveyor below as "accepts" for the final product for market. Larger pieces that do not fall through continue to the end of the line where they fall onto another conveyor to be recirculated. The disc screen is the single component that is most responsible for both quality and quantity.

It is undisputed that Lane Supply knew that Morse Bros. wanted a process that was comparable to Jolly Gardener.

Richardson was personally familiar with the Jolly Gardener system and contacted West Salem Machinery (WSM) of Oregon which supplied the Jolly Gardener equipment; however, he was not aware or failed to consider that Jolly Gardener utilized an extra step to pre-grind the bark, that the Jolly Gardener disc had to be retrofitted to obtain a production rate of 500 cubic yards and that he did not supply WSM with all necessary particularized information.

Richardson was also familiar with Morse's operation in Windham and knew that Morse Bros. intended to move some of its equipment to Auburn, including the hammermill. They knew that a high volume disc screen would be required. Although

7

WSM was aware that its disc screen was intended to installation at Morse Bros., it acted through Michael Richardson at Lane Supply.

WSM through DeSouza made specific recommendations for the Morse Bros. plant (Pl. Ex. #39) which would accommodate Morse Bros.'s request for a smaller IFO (interface opening) so that only smaller "accepts" would fall through the screen.

In order to produce product at a maximum level of up to 500 cubic yards per hour, it was necessary that Morse Bros.'s screens be larger than Jolly Gardener's so that more product is on the screen to produce more "accepts" falling through. If Morse Bros. was to use a smaller IFO than Jolly Gardener, it would take more product to be screened because of a larger portion of "overs" or larger pieces being rejected.

Morse assured Richardson that the hammermill could handle the increased capacity; however, it didn't.

When there was not sufficient product on the screen, Morse Bros. realigned the conveyor to place the bark further onto the screen, thus decreasing the amount of time on the screen and reducing the number of "overs" that would fall though.

The court attributes the problems with the disc screen to the lack of a specific contract and clear specifications or requirements, capacity limitations with Morse Bros.'s own hammermill brought from Windham, and Morse Bros.'s own modifications to the system without consulting with Lane Supply or WSM.

E.    Barn Cleaners

Barn cleaners operate at the end of the line and are intended to run periodically to act as sweepers to remove excess bark product that spills over from the conveyors and machines.

Lane Supply sold four barn cleaners to Morse Bros. to be installed in the production line; however, only one is in operation, and two had to be cannibalized for parts. Lane Supply obtained the barn cleaners from a third party, Cornell Industries.

There is no dispute that the barn cleaners do not operate as intended to recover and sweep away bark that spills over. Consequently, Morse Bros. must have its employees oversee this part of the process to manually clean the area and to maintain the barn cleaners and adjust or fix them when they jam. When Morse originally requested proposals, it specified that it "would also like a simple low manpower cleaning system to be included." (Def. Ex. # 20).

Tim Morse told Richardson that he wanted a system to clean up the spillage, set on a timer to go on and off as needed. It was supposed to replace a worker.

The barn cleaner in the bagging area is operable but has some problems. It is necessary to have a person there about 10 hours per week to assist in keeping the area clean.

In the production area the barn cleaner has been shut off in favor of a person with a Bobcat tractor to do the cleaning.

Although Lane Supply sold the barn cleaners to Morse Bros., they were installed by plaintiff's employees.

Darren Miller of Cornell Industries testified that the equipment was appropriate for Morse Bros.'s operation, but acknowledged several deficiencies that caused the problems.

The court cannot find that the barn cleaner machinery itself was defective; however, because Lane Supply accepted the responsibility to provide design and layout specifications to Morse Bros., it also was responsible to provide appropriate instruction, manuals, and direction for installation and maintenance which it failed to do. Lane

9

Supply also failed to provide appropriate assistance to remedy the problem and refused to discuss a remedy, all of which is directly related to and is a cause of Morse Bros.'s inability to utilize the machine as intended. It needs to be replaced with a more efficient system.

## F. Negligence Claims

Lane Supply is correct that Morse Bros. is not entitled to recover in tort for what are breach of contract and breach of warranty claims. *Oceanside at Pine Point Condominium Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267 (Me. 1995). Additionally, to the extent that it remains applicable, the court finds that plaintiff has not proven any misrepresentation by Lane Supply as to its expertise or ability to design and provide appropriate equipment for Morse Bros.'s production lines and desired capacity. Rather, Lane failed to do so as to several components.

## G. Consequential Damages

Morse seeks compensation for lost sales and profits because of its inability to have sufficient product to meet the demands of its customers. Plaintiff's estimate is based on past sales and its lack of production capacity to meet customers' requests.

The court finds that without a second line of production, Morse was not able to produce sufficient product to meet the demands of customers; however, its estimate of almost $420,000 is high because Morse did not consider that some past customers might not re-order, if at all.

## H. Counterclaim

Lane Supply has filed a counterclaim seeking over $100,000 for unpaid invoices for parts and equipment that it supplied as part of the project. It also seeks interest (1.5% per month, 18% per annum) on unpaid invoices plus attorney fees and expenses.

10

Lane Supply argues that interest on unpaid balances and legal fees are permissible based on a credit agreement between Morse Bros. and Lane Supply executed in 1994, well before this project was contemplated. The relevant part of the agreement states:

> CREDIT TERMS: 1% cash discount if invoices are paid within 10 days, net 30 days. Service charges of 1 ½% per month (ANNUAL PERCENTAGE 18%) on all unpaid balances exceeding 60 days.
>
> . . . .
>
> I understand the above Credit Terms and agree to comply with these Terms. If I fail to comply with the above Terms, I agree to pay all costs of collection of my account balance, including reasonable attorney's fees and court costs.[3]

(Def. Ex. #13)

Not only did the lack of a written contract complicate the parties' actions, but also there was no agreement at the beginning as to charges by Lane Supply and payment by Morse Bros. The six-year old credit agreement came into play after Morse Bros. failed to make some payments and the parties negotiated a payment plan which specifically included waiver of two months interest or finance charges if Morse Bros. made certain payments. (*See* Pl. Ex. #21.) The payments were not made and Lane Supply seeks to recover all finance charges.

There was internal communication within Lane Supply Co. about reigning in Morse's account, getting payment and limiting outstanding balances, *See* Pl. Ex. #5 – 9, but no communication with Morse until mid-March. Pl. Ex. #10.

---

[3] It is well established that under the "American Rule" attorney's fees are recoverable only when authorized by law (statute) or by an agreement of the parties. To the extent that any attorney fees are recoverable here, they apply to the collection of unpaid balances subject to the Credit Agreement and not to any fees or expenses relative to defense of the complaint and principal action.

11

In addition to unpaid invoices, Lane Supply seeks recovery of a deposit which it was unable to recover from WSM for the screen when Morse Bros. cancelled the order.

To the extent that Lane Supply is entitled to interest or finance charges, the court finds that the original credit agreement was modified in writing to 13% annually and that it was not contingent on other factors. The modification does not provide for recovery of attorneys fees nor does it make reference to the prior agreement.

In the memorandum of June 7, 2001, John Ryder of Lane supply memorialized the discussions and agreements of a meeting held on May 31st. The agreement includes several items that impact amounts owed by Morse to Lane:

| | |
|---|---|
| 1. Returns for credit | $ 20,905.40 |
| 4. Money issues | |
| Morse balance to Lane | 120,958.39 |
| Less credits | 20,905.40 |
| Balance due to Lane | 100,052.99 |

*See* Pl. Ex. #21.

The memorandum also states in the "return for credit" section, "reducing finance charges from 18% to 13% on a balance to be mutually agreed upon."

Benjamin Hawkins, Morse's chief financial officer, agrees that Morse was to pay 13% interest on outstanding balances but disputes the amount owed and that Morse was not given proper credits. He maintains that Morse owed approximately $50,000, not the $100,000 claimed by Lane.

The court finds that the memorandum of June 7, 2001 correctly states the amount owed at that time.

## IV. SUMMARY

The court is satisfied that plaintiff has proven by a preponderance of evidence that Lane supply Company breached the contract to design a dual bark mulching system for Morse and that as to some components it failed to adequately remedy Morse's problems resulting in a breach or warranty.

The court also finds that Morse is indebted to the defendant in the amount of $100,052.99 plus interest at 13% per annum from June 1, 2001.

### A. Plaintiff's Damages

The court assess damages for plaintiff Morse Brothers as:

| | | |
|---|---|---|
| 1. Metering wheel | $ | 1,447.00 |
| 2. In-feed conveyor | | 18,908.00 |
| 3. Barn cleaners (including repair, replacement and associated labor costs) | | 183,038.00 |
| 4. Lost profits | | 275,000.00 |
| | Total | $ 478,393.00 |

### B. Defendant's Damages

The court finds that Morse Brothers is indebted to Lane supply Co. in the amount of $100,052.99 plus interest of $55,531.58 from June 1, 2001 at 13% per annum.[4]

## V. JUDGMENT

The clerk will enter judgment as follows:

---

[4] The court calculates the *per diem* interest at $35.62 for 1559 days since June 1, 2001.

13

**A. On the Complaint**

Judgment for plaintiff against defendant in the amount of $478,393 plus interest pursuant to Title 14 M.R.S.A §§ 1602 and 1602-A.

**B. On the Counterclaim**

Judgment for defendant against plaintiff in the total amount of $155,584.57. This amount may be set-off against plaintiff's judgment on the complaint.

**C. Costs**

No costs pursuant to rule and statute are awarded to either party.

**D. Attachment**

Plaintiff may have an attachment, including trustee process, against the real estate, goods, chattels and credits of defendants in the amount of $322,808.43.

SO ORDERED.

DATED: September 8, 2005

Thomas E. Delahanty II
Justice, Superior Court

14